### IN THE UNITED STATES DISTRICT COURT
### FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Q.H., by and through her parent, REGAN H., | : | No. 3:24cv1620 |
| Plaintiff | : | |
| | : | (Judge Munley) |
| | : | |
| v. | : | |
| | : | |
| SCRANTON SCHOOL DISTRICT, | : | |
| Defendant | : | |

:::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

### MEMORANDUM

The Individuals with Disabilities Education Act ("IDEA") makes a promise to public school students with disabilities: school districts will find you, evaluate you, and provide you services if it is determined that you need them.  But a school district cannot find a student who was never there.

Plaintiff brings this action under the IDEA, 20 U.S.C. § 1400, *et seq.*, seeking reversal of a hearing officer's decision in favor of Defendant Scranton School District where he could not untangle an elementary school student's lack of academic success from her extreme truancy. [1]  Before the court are cross-filed motions for judgment on the expanded administrative record pursuant to 20

---

[1]  On January 28, 2025, the parties executed a stipulation authorizing plaintiff to withdraw her claims asserted under Section 504 of the Rehabilitation Act and the Americans with Disabilities Act.  (Doc. 24).  On May 16, 2025, the court granted in part and denied in part a motion for summary judgment filed by Defendant Scranton School District, narrowing the issues to an IDEA Child Find claim. (Doc. 33).

U.S.C. § 1415(i)(2).  For the reasons that follow, the school district's motion will be granted, and the parent's motion will be denied.

**Background**

### 1. Statutory Framework

The IDEA guarantees children with disabilities a "free appropriate public education" ("FAPE") tailored to their individual needs. 20 U.S.C. § 1412(a)(1)(A). As a condition of receiving federal special education funding, each state must adopt policies and procedures ensuring that all children with disabilities within the state who are in need of special education and related services are identified, located, and evaluated. 20 U.S.C. § 1412(a)(3).  That is, "[t]o comply with the IDEA, school districts must identify and evaluate all children who they have reason to believe are disabled under the statute." Munir v. Pottsville Area Sch. Dist., 723 F.3d 423, 426 (3d Cir. 2013) (citing D.K. v. Abington Sch. Dist., 696 F.3d 233, 244 (3d Cir. 2012)).  The "identify" part of this obligation is referred to as Child Find. See D.K., 696 F.3d at 244.

This case concerns Scranton School District's Child Find obligations to Q.H. in light of the child's consistent non-attendance.  Regan H. contends that, despite these truancy issues, the district violated IDEA's Child Find mandate by failing to identify and evaluate Q.H. at a much earlier moment in her education. Following a due process hearing, however, the hearing officer determined that

2

the district met its Child Find obligations.  The parent finds fault in the hearing officer's ruling and requests judgment in the student's favor.[2]  The district requests that the hearing officer's decision be affirmed.

## 2. Factual History

Q.H. was born in February 2016.[3]  She was enrolled in the Scranton School District in Kindergarten during the 2021-2022 school year.  (Doc. 34, JCMP at 2).  She was promoted to First Grade for the 2022-2023 school year and then to Second Grade for the 2023-2024 school year.

Q.H.'s elementary school attendance, or lack thereof, cannot be overlooked.  This case does not involve a handful of absences.  Rather, from Kindergarten to the end of Second Grade, Q.H. accrued *174 unexcused absences* with additional excused absences and tardiness notations in her attendance record over that period.  (Doc. 34, JCMP at 2; Doc. 19-7, SSD Ex., at 32–64, 79, 130–31, 148–159, 164–66, 207–212, 226–232, 238).

---

[2] In conjunction with her motion for judgment on the administrative record, Regan H. seeks 54 hours of compensatory education for speech and language instruction, 280 hours of compensatory education for reading instruction, and 280 hours of compensatory education for math instruction.

[3] The facts relevant to the parties' cross-motions are taken from the administrative record, (Doc. 19), and the facts designated by the parties as undisputed in their joint case management plan ("JCMP"), (Doc. 34).  Where unchallenged by either party, the court also cites to the hearing officer's findings of fact.  (Doc. 19-3 at p. 3–17).

In conjunction with Q.H.'s poor attendance in Kindergarten, First Grade, and Second Grade, the district engaged or attempted to engage Regan H. regarding student attendance improvement plans. (Doc. 19-7, SSD Ex., at 32–64, 79, 130–31, 148–159, 164–66, 207–212, 226–232, 238).  Despite those measures, unexcused absences continued, and the district filed truancy charges in Magisterial District Court when the child was in First Grade. Id.  According to the record, truancy proceedings culminated with contempt hearings in the Lackawanna County Court of Common Pleas in 2024 when Q.H. was in Second Grade.  Regan H. failed to appear for several truancy hearings. Id.

Against this backdrop, Regan H. asserts that the district should have identified and evaluated Q.H. much sooner based upon: 1) her demonstrable speech and articulation needs; 2) her poor performance on standardized testing in Kindergarten, First Grade, and Second Grade; and 3) earlier communications from Regan H. and maternal grandmother for testing or more help.

### *Kindergarten: A Troubling Start*

In Kindergarten, Q.H. was absent without excuse for *83* of 180 instructional days.[4] (Doc. 19-3, Hearing Officer Decision ¶ 1).  The child was absent from school when standardized benchmark tests were administered in the Fall of 2021

---

[4] Q.H. also had six excused absences that year. (Doc. 19-8, Parent Ex., at 101).

4

and the Spring of 2022. Id. ¶¶ 3, 5.  She scored in the single-digit percentiles in curriculum-based testing when administered in the Winter of 2021. Id. ¶ 4.  Q.H. ended Kindergarten with "below-basic" grades (or was not evaluated) in almost every category of reading and mathematics.  Id. ¶¶ 8–9.

Regan H. requested that Q.H. repeat Kindergarten. Id. ¶ 10.  The request was denied, and the student was promoted to First Grade. Id.

### First Grade: Interventions Implemented, Absences Persist

In First Grade, Q.H. was absent without excuse for at least *50* of 180 instructional days.[5] Id. ¶ 13.  She scored zero or in the single-digit percentiles on benchmark testing in First Grade. Id. ¶¶ 14–15, 18–21, 25–27.  In October 2022, Regan H. requested that Q.H. be sent back to Kindergarten. Id. ¶ 16.  The principal and teacher discussed and decided that the student should remain in First Grade. Id. ¶ 17.

Q.H. was placed in a Title I reading program in First Grade.  The First Grade teacher saw no progress in that program and implemented MTSS (Multi-Tiered System of Supports) for Q.H., along with modified assignments and homework.  (Doc. 19-5, H.T. Vol. II, M. Byron Testimony, 181:7–183:12)

---

[5] A report card from First Grade in the administrative record tallied 52 unexcused absences, five excused absences, one early dismissal, and 13 tardiness notations.  (Doc. 19-8, Parent Ex., at 103).  Based on this report card, Q.H. missed instructional time on 71 of 180 school days.

At the end of First Grade, Q.H. had not mastered the alphabet and had no concept of phonics. (Doc. 19-3, Hearing Officer Decision, ¶ 27).  Q.H.'s teacher also noted that her excessive absenteeism impacted her progress. Id. ¶ 25.  The district promoted the student to Second Grade. Id. ¶ 28.

### Second Grade: Evaluation Completed, Truancy Unresolved

On September 10, 2023, at the beginning of Second Grade, Regan H. returned a handwritten medical emergency card to the district.  She indicated:

(Doc. 19-7 at 160).

Regan H. asserts that this note was a request to evaluate Q.H. for a disability.[6]  The hearing officer thought otherwise, concluding that such a request did not come until November 2023. (Doc. 19-3, ¶ 32).

Additionally, after this note was submitted, Q.H.'s attendance issues persisted.  She was absent from school on September 18, 21, 22, 25, 26, and 27, 2023, either with a parent excuse or as an unexcused absence. (Doc. 19-7 at

---

[6] Regan H. testified that she requested an evaluation in October 2023. (Doc. 19-4, H.T. Vol II, 65:3-7).

231). On September 27, 2023, due to these absences, the building principal scheduled a school attendance improvement plan ("SAIP") meeting for Q.H., emailing her teacher with that information. Id. at 159. Q.H.'s teacher responded indicating that she had contacted Regan H. earlier that month and also supplied a possible reason for the student's absences:

---

**Re: Truancy**
1 message

Cathy Devereaux <catherine.devereaux@ssdedu.org>                    Wed, Sep 27, 2023 at 10:59 AM
To: Lisa McConlogue <lisa.mcconlogue@ssdedu.org>

Q███H███
Contact with Mom. 9/14. Discussed what Q███ was struggling with and what I would be sending home to help with alphabet and beginning sight words. Parent said her lawyer is working on having her moved to DePaul school. None of the supplemental work has been returned. She has been out with suspected covid since 9/21. Sent home from nurse that morning. No one has contacted me since. I thought I had an email from the nurse but we talked face to face.

---

Id.

The district conducted the SAIP meeting on October 11, 2023 with Regan H. and maternal grandmother present. Id. at 62–64.

Q.H.'s second grade teacher further corresponded with Regan H. through the student's planner. On October 24 or 25, 2023, the following message was returned to the teacher:

> Myself and my boyfriend have full time jobs. 15 pages of homework is very difficult. When we get home [usually] around 8:00 pm and she is ready for bed. That is why I wanted her back in 1st grade. So she is on her level. Sorry we are doing our best. She should learn this in school. It's crazy. She missed 4 days because she had Covid and got sent home, 2 other days because she was sick. This is CRAZY! She has 15 pages of homework! Nightly

Id. at 137.

On November 16, 2023, the Scranton School District issued a notice and consent form for special education testing. Id. at 65–67.  Regan H. provided written consent for testing by signing and dating the document on November 25, 2023. Id.  Regan H. also completed a history form to aid in the evaluation. Id. at 67–77.  The district noted receipt of consent to evaluate on December 4, 2023. Id. at 78.

After the district tested Q.H. through a series of measures, an Evaluation Report ("ER") was completed and provided to Regan H. on January 30, 2024. Id. at 80–129.  The ER identified Q.H. as "other health impaired" for anxiety and as speech and language impaired. Id.  Based on the recommendations of the ER, the district issued an Individualized Education Program ("IEP") and Notice of Recommended Placement dated February 27, 2024.[7] Id.  Following the evaluation, specialized education services were recommended. Id.  The evaluating psychologist recommended testing as to whether Q.H. had a specific learning disability. Id.  As the psychologist testified in this matter, excessive absences prevented the identification of any learning disability at that time. (Doc. 35, A. O'Brien Testimony 22:12-19).

---

[7] The IEP called for 40 minutes of supplemental reading and supplemental math instruction, five days per week.  The IEP also called for 12 speech and language sessions per quarter in 30-minute sessions.  (Doc. 19-4, H.T. Pt. 3, K. Lalli Testimony, 418:10–419:17).

Q.H. continued to accrue unexcused absences over the period of testing and IEP implementation, on November 16, 17, 21, 29 and December 5, 8, 11, 19, 21, 22, 2023. Id. at 231.  The district stopped accepting parent excuses after January 2, 2024. Id.  Q.H. was then absent without excuse on January 8, 16, 17, 19, 23, 25, 30 and February 5, 6, 20, 22, 23, 27, 28, and 29. Id.

On February 20, 2024, a truancy contempt hearing was scheduled before the Honorable Mary Walsh Dempsey of the Lackawanna County Court of Common Pleas. Id. at 130.  Regan H. and Q.H. failed to appear. Id. at 165–166. The matter was scheduled for a review hearing by Zoom for March of 2024. Id.

Q.H. continued to miss school over the final months of Second Grade. Id. at 232.  Ultimately, in Second Grade, Q.H. was absent without excuse for *41* of 180 instructional days. (Doc. 19-3, ¶¶ 8–9).  Regan H. then failed to appear at a state court truancy review hearing in May 2024. Id. ¶ 60.

### 3. The Administrative Proceedings

When Q.H. was in Second Grade, Regan H. filed a complaint for a due process hearing asserting that the district failed to timely evaluate and determine that Q.H. was eligible for special education services under the IDEA, i.e., a Child Find claim.  Following two hearing sessions in June 2024, the hearing officer issued a decision in favor of the district, dated July 23, 2024. (Doc. 19-3).

9

Despite finding in favor of the Scranton School District, the hearing officer's decision strongly rebuked both Regan H. and the district—Q.H.'s mother for failing to ensure that her child attended school and the district for its "slavish devotion to grade promotion[.]" Id. at 19.  The hearing officer described both Regan H. and Scranton School District as committing "educational abandonment." Id. at 20.

Those observations aside, the hearing officer ultimately concluded, "it is impossible to untangle the student's lack of age-normed or grade-normed achievement from the impact of absenteeism." Id. at 20.  "The student has missed, without excuse, nearly a third of the instructional days through 2nd grade," he wrote.  "There is simply no way to fault the District for any failure of its child-find obligation." Id.

### 4. The Testimony of Anita O'Brien

Regan H. appealed the hearing officer's decision by filing a complaint in this court in September 2024. (Doc. 1).  The district filed the administrative record in January 2025. (Doc. 19).

An issue in this case arose over the testimony of Anita O'Brien, the school psychologist who examined Q.H. for the Evaluation Report.  O'Brien was not available for the due process hearing.  The hearing officer denied Regan H.'s request to keep the record open for her testimony, stating that the Evaluation

Report spoke for itself.  On February 6, 2025, the court granted plaintiff's request to expand the record with the testimony of O'Brien. (Docs. 25–26).  O'Brien's testimony has been filed of record and is considered below.  (See Doc. 35).

**Standard of Review**

In reviewing a state administrative decision under the IDEA[8], the court applies a "modified de novo" standard of review, S.H. v. State-Operated Sch. Dist. of Newark, 336 F.3d 260, 270 (3d Cir. 2003), which is a "nontraditional" standard, Mary T. v. Sch. Dist. of Phila., 575 F.3d 235, 241 (3d Cir. 2009).

While the court conducts an independent review, it must afford "due weight" to the hearing officer's determination and consider the hearing officer's factual findings as prima facie correct. Abigail P. through Sarah F. v. Old Forge Sch. Dist., 105 F.4th 57, 63 (3d Cir. 2024) (citations omitted).  That means the court must explain its reasoning if it departs from the hearing officer's findings. See S.H. 336 F.3d at 270.  The court "must accept the hearing officer's credibility determinations, 'unless non-testimonial extrinsic evidence in the record justifies a contrary conclusion.' " Abigail P., 105 F.4th at 63 (quoting D.K., 696 F.3d at 243) (capitalization removed and brackets omitted); see also D.S. v. Bayonne Bd. of Educ., 602 F.3d 553, 564 (3d Cir. 2010) (explaining that a hearing officer's credibility determinations are afforded "special weight").  In an appeal of a

---

[8] As this matter arises under the IDEA, the court has jurisdiction pursuant to 28 U.S.C. § 1331.

11

hearing officer's decision regarding alleged IDEA violations, the party judicially challenging that decision bears the burden of persuasion with respect to the finding for each claim challenged. Blunt v. Lower Merion Sch. Dist., 767 F.3d 247, 269 (3d Cir. 2014).

Furthermore, the IDEA expressly provides that, in any civil action brought under the statute, the court "shall hear additional evidence at the request of a party." 20 U.S.C. § 1415(i)(2)(C)(ii).  Where the court "hears additional evidence it is 'free to accept or reject the agency findings depending on whether those findings are supported by the new, expanded record and whether they are consistent with the requirements of the [IDEA].' " S.H., 336 F.3d at 270 (quoting Oberti by Oberti v. Bd. of Educ. of Borough of Clementon Sch. Dist., 995 F.2d 1204, 1220 (3d Cir. 1993)).

In this case, the court permitted the post-hearing testimony of Anita O'Brien as additional evidence pursuant to 20 U.S.C. § 1415(i)(2)(C)(ii).  The court has incorporated that testimony into its review and considers it as part of the expanded record upon which this decision is based.  The hearing officer's factual findings remain entitled to prima facie correctness to the extent they are not controverted by the additional evidence. See S.H., 336 F.3d at 270.

According to the modified de novo standard of review, the court is required to make findings of fact based on the preponderance of evidence contained in

complete record. See S.H., 336 F.3d at 270 (citation omitted). This standard "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley, 458 U.S. 176, 206 (1982).

**Analysis**

### 1. The Hearing Officer's Determinations are Supported by the Record

The hearing officer concluded that the district did not violate its Child Find obligation under the IDEA. In doing so, he concluded, "it is impossible to untangle the student's lack of age-normed or grade-normed achievement from the impact of absenteeism." (Doc. 19-3 at 20).

Before turning to the merits, the court addresses the hearing officer's credibility findings. The hearing officer found all witnesses credible. Id. at 17. Notably, however, the hearing officer further found that the speech and language pathologist testified more credibly than the district witnesses who denied observing any articulation needs — a finding consistent with Q.H.'s Evaluation Report, which itself identified a need for speech services. Yet the hearing officer declined to award compensatory education in the form of additional speech and language sessions.

At first glance, these findings appear to be in tension with the hearing officer's ultimate determination.  Upon careful and searching review of the administrative record, however, the court finds that tension to be reconcilable.  The record is replete with testimony from witness after witness describing the formal and informal supports and interventions that district teachers implemented for Q.H. — efforts that were consistently undermined by the child's chronic non-attendance.  A school district cannot be expected to identify and evaluate a student for a disability when that student is not present to be observed.  Nor can a district be faulted for providing informal interventions when a student's absences obscure the causes of academic struggle, rendering a formal evaluation premature.  And as discussed below, the speech pathologist confirmed that Q.H. was evaluated in a timely manner.  The court therefore reaches the same conclusion as the hearing officer: the district did not violate the IDEA's Child Find obligations.

The goal of the IDEA "is to ensure that educators and parents have necessary tools to improve educational results of disabled students." Blunt, 767 F.3d at 303 (citing 20 U.S.C. § 1400).  "School districts have a continuing obligation under the IDEA ... to identify and evaluate all students who are reasonably suspected of having a disability." P.P. v. West Chester Area Sch. Dist., 585 F.3d 727, 738 (3d Cir. 2009) (citation omitted).

14

At the same time, "[n]either the IDEA, its implementing regulations, nor the applicable Pennsylvania regulations establish a deadline by which children who are suspected of having a qualifying disability must be identified and evaluated." Ridley Sch. Dist. v. M.R., 680 F.3d 260, 271 (3d Cir. 2012). The Child Find obligation requires that a district act within a reasonable time after school officials are placed on notice of behavior likely to indicate a disability. Id. (citation omitted). The "reasonable time" standard is not a bright-line rule and requires consideration of the information and resources possessed by the district at a given point in time. Id. The Third Circuit has further cautioned that Child Find assessments are conducted on a case-by-case basis, considering the totality of the circumstances. Id.

At the center of the hearing officer's determination was a stark factual finding: Q.H. was absent without excuse for approximately 175 school days across three grades — truancy so severe that it prompted proceedings in both the Magisterial District Court and the Lackawanna County Court of Common Pleas. This factual predicate is difficult to overcome when trying to demonstrate that the district is responsible for an unwarranted delay in identifying and evaluating Q.H.

For her part, Regan H. points to low test scores and poor grades in Kindergarten, First Grade, and Second Grade. Regan H. also points to earlier

15

requests by the family for evaluations.  Assuming those requests occurred, "schools need not rush to judgment or immediately evaluate every student exhibiting below-average capabilities especially at a time when young children are developing at different speeds and acclimating to the school environment." D.K. v. Abington Sch. Dist., 696 F.3d 233, 252 (3d Cir. 2012).  Thus, at the early elementary level, the law accounts for variations in child development, maturity, and school readiness skills.

The question is whether the school district was in a position to determine whether Q.H. displayed typical variations or atypical variations, such as those indicative of a disability.  The problem is that, by not ensuring regular attendance, Regan H. gave the school a small sample size to work with.

For example, all of Q.H.'s teachers testified during the administrative hearing.  Q.H.'s Kindergarten teacher testified regarding her school success, attendance, and promotion to the next grade. (Doc. 19-4, H.T. Pt. 3, M. Walsh Testimony, 530:10–531:18).  The Kindergarten teacher observed that Q.H. was unsuccessful because of her frequent absences. Id.  The teacher also noted her own inability to get to the bottom of Q.H.'s academic issues.  "Had she been there," the Kindergarten teacher testified, "I felt like she could have done a lot better. And because she wasn't there, it was hard to tell. It was hard to gauge that." Id.

16

Q.H.'s First Grade teacher testified that she did not believe a special education evaluation was warranted.  (Doc. 19-5, H.T. Pt. 2, M. Byron Testimony, 173:10-12).  She explained, "due to her truancy, I wasn't sure if her being evaluated was the right route to go, because there wasn't enough data or, you know, information to base that off of." Id., 173:25–174:10.

In First Grade, Q.H. was also provided with Title I instruction in reading, instructional and testing modifications, and additional supports through the district's MTSS framework. Id., 181:7–183:12, 190:12–191:8.   Q.H.'s First Grade teacher testified that the child's attendance issues prevented those supports and interventions from being successful. "I didn't know whether she was struggling because of truancy," she testified, "or if she was struggling because something else was going on." Id., 191:13–192:13.  As the teacher further explained during the due process hearing, "[Q.H.] wasn't coming to school, and it was very hard to keep it – to build on that." Id., 182:9–183:12.

Regan H. argues that the district improperly substituted the MTSS framework for a formal disability evaluation.  From review of the testimony, however, the district's deployment of tiered interventions was responsive for the circumstances based on Q.H.'s irregular attendance.

Q.H.'s Second Grade teacher made many of the same observations.  In a letter prepared for state court truancy proceedings, the teacher detailed her

17

concerns regarding Q.H.'s academic performance. (Doc. 19-7, SD Exhs., C. Devereaux Ltr., at 132).  She wrote:

> All of the academic deficits are directly related to the fact that this child does not come to school  Three years now and we are still saying the same thing over and over.  Her excessive absence has cause her to miss so much teacher instruction.  Furthermore, the work she misses is sent home and NOT DONE or returned to school.

Id.

Regan H. further argues that the evaluation should have occurred earlier in Second Grade.  Specifically, she requested "significantly more educational assistance" on Q.H.'s medical emergency card, which was returned at the beginning of Second Grade. [9]  (Doc. 19-7 at 160).  "More educational assistance" could mean many things.  As detailed above, Q.H.'s teachers testified that the district provided Q.H. with Title I reading instruction in First Grade and Title I math instruction in Second Grade.  Q.H. also received MTSS supports beginning in First Grade, including small group instruction, modified instruction and testing, and modified homework.  In Ridley School District, the Third Circuit gave credence to a hearing officer's determination that a Child Find violation did not occur where the school district "appeared to be invested in addressing [the student's] needs and provid[ed] appropriate instruction and interventions before

_____

[9] As for plaintiff's arguments related to Q.H.'s speech and articulation needs, Regan H. did not mark off any notations regarding speech just above the line for her comments on this form.

rushing to special education identification." 680 F.3d at 272.  Those same circumstances are present in this case, compounded by Q.H.'s chronic attendance issues and the district's clear efforts to use the state court system to ensure that Q.H. attended school.[10]   Here, the district continued to take affirmative steps over three years to address Q.H.'s extreme and persistent absenteeism and provide her with supports and interventions in a regular education setting.  Chronic absenteeism provided an objectively reasonable non-disability explanation for any of Q.H.'s academic struggles prior to formal testing and evaluation.  Thus, after reviewing the testimony of the teachers on the frontline regarding attendance and the supports provided, the hearing officer's findings will not be disturbed.

---

[10] There are federal and state-level criteria for determining the existence of a specific learning disability.  Under federal regulations, "[a] child must not be determined to be a child with a disability… [i]f the determinant factor for that determination is— (i) Lack of appropriate instruction in reading, including the essential components of reading instruction…[or]…(ii) Lack of appropriate instruction in math[.]" 34 C.F.R. § 300.306.  Under state regulations, each school district shall "[e]nsure that underachievement in a child suspected of having a specific learning disability is not due to lack of appropriate instruction in reading or mathematics by considering documentation that" the child was provided "scientifically-based instruction in regular education settings" as well as "repeated assessments of achievement [] conducted at reasonable intervals."  22 PA. CODE § 14.125.

Here, Q.H. missed extensive instructional time, a full school year in her first three years of school.  She missed so much time that two benchmark tests could not be administered in Kindergarten.  The district responded to attendance issues and poor academic performance by providing Title I instruction and MTSS supports in First Grade.  Against the backdrop of the above promulgated regulations, the failure to evaluate Q.H. for a disability until Second Grade does not demonstrate a Child Find violation in this case.  Teachers cannot provide "appropriate instruction" to a child that is regularly absent.

On one last note regarding the administrative record, Regan H. argues that the hearing officer erred in declining to award compensatory education, including additional speech therapy sessions.  That argument is unpersuasive.  A hearing officer's skepticism toward certain witness testimony does not automatically translate into an entitlement to compensatory relief — the two inquiries are distinct.  Here, the hearing officer credited the testimony of the reviewing speech pathologist, who provided the most clinically grounded account in the record.  Contrary to the parent's position, the speech pathologist testified that Q.H.'s speech-articulation errors were age-appropriate and that initiating a formal speech evaluation in Kindergarten or First Grade would itself have been premature. (Doc. 19-3, H.T., Vol II, L. Davies Testimony 286:22–288:6).  In her professional judgment, Q.H. was evaluated in a timely manner.  Id.  That testimony, which the hearing officer was entitled to credit, forecloses any finding that the district withheld services to Q.H.  The court therefore finds no basis to disturb the hearing officer's determination that compensatory education was not warranted.

### 2. The Post-Hearing Testimony of the Evaluating Child Psychologist Does Not Warrant Reversal

Pursuant to 20 U.S.C. § 1415(i)(2)(C)(ii), the court permitted the testimony of a school psychologist, Anita O'Brien, as additional evidence to consider with the administrative record.  O'Brien's testimony also does not warrant reversal of

the hearing officer. The hearing officer's findings are not controverted by this additional evidence. If anything, the hearing officer's findings are supported by O'Brien's testimony.

As the additional testimony reflects, O'Brien was a contracted psychologist brought in to participate in Q.H.'s Evaluation Report, which was compiled from testing, observations, and evaluations when the child was in Second Grade. (Doc. 35, A. O'Brien Testimony 32:8-15). O'Brien was not employed by the district or available regularly at Q.H.'s school. Id. Consequently, O'Brien was not involved with MTSS supports or child study, nor was O'Brien available to provide teachers with interventions. Id., 35:11-24.

Plaintiff attempted to have O'Brien testify that Q.H. should have been evaluated sooner. Id., 9:11–18:12. That attempt failed. To the extent that O'Brien's testimony could be construed in that manner, it is informed by hindsight and discounted. And, as the court sees it, O'Brien's testimony largely favored the district and favors affirmance of the hearing officer in this case.

For example, O'Brien reviewed Q.H.'s attendance records during her testimony. In O'Brien's opinion, after all of the child's Kindergarten absences, she would have placed Q.H. on MTSS and "review[ed] her records, her absentees, tr[ied] to gather more information, investigate[d] the reasons why she was absent." Id.,19:18–20:2. The district did all of that. District records and the

21

uncontroverted testimony from Q.H.'s First Grade teacher reflect that MTSS supports were put in during that school year.  In addition, the district also targeted the truancy issues.  It staged attempted school attendance intervention meetings before filing truancy charges against the parent in state court.

O'Brien also opined that after Q.H.'s absences in First Grade, she would have "look[ed] to administer a permission to evaluate." Id. 20:25–21:11.  The district did exactly that when Q.H. was in Second Grade.  It also continued attempts to compel the child's attendance through state court proceedings.

Furthermore, O'Brien's testimony was indicative of the larger, troubling picture.  According to O'Brien, Q.H. was absent from school "excessively." Id., 37:25–38:12.  During the evaluation process, O'Brien came to the school on "several occasions" when the child was not there. Id.  That is, according to O'Brien's testimony, the district started an evaluation process as the parent had requested, and the child continued to be absent during that process.  O'Brien's testimony completes the picture of help offered — and help declined, repeatedly.

**Conclusion**

Accordingly, based on an independent review of the expanded record, the hearing officer's determinations are correct, and the additional evidence does not warrant reversal.  The decision of the hearing officer will be affirmed by granting

22

the school district's motion for judgment on the expanded administrative record.

The parent's motion will be denied.  An appropriate order follows.

Date: 2/24/26

BY THE COURT:

_____
JUDGE JULIA K. MUNLEY
United States District Court

23